IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| COREY L. LUCAS, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Action No. 2:14-cv-319 |
| | : | |
| CAROLYN W. COLVIN, | : | |
| Acting Commissioner, | : | |
| Social Security Administration, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

*Pro se* Plaintiff Corey L. Lucas ("Mr. Lucas") filed a complaint pursuant to 42 U.S.C.

§ 405(g) seeking judicial review of the final decision of the Defendant, the Acting Commissioner

of the Social Security Administration ("Acting Commissioner"), denying Mr. Lucas's claim for

Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act.  Both

parties have filed motions for summary judgment, ECF Nos. 14 and 16, which are now ready for

recommended disposition.  This action was referred to the undersigned United States Magistrate

Judge ("the undersigned") pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil

Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002 Standing

Order on Assignment of Certain Matters to United States Magistrate Judges.  ECF No. 8.  After

reviewing the briefs, the undersigned makes this recommendation without a hearing pursuant to

Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J).  For the following reasons, the

undersigned **RECOMMENDS** that Mr. Lucas's motion for summary judgment, ECF No. 14, be

**DENIED**; the Acting Commissioner's motion for summary judgment, ECF No. 16, be

GRANTED; the final decision of the Acting Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## I. PROCEDURAL BACKGROUND

On June 27, 2011, Mr. Lucas filed his application for DIB, alleging a disability onset date of April 30, 2009, due to "diabetes, neuropathy in hands and feet, pancreatitis, diverticulitis, [and] bipolar disorder." R. 155-59, 213.[1] To qualify for DIB, Mr. Lucas was required to have insurance coverage at the time of disability onset. 42 U.S.C. § 423(a); 20 C.F.R. §§ 404.101(a); 404.131(a). Mr. Lucas's date last insured ("DLI") was December 31, 2014. R. 25. Accordingly, Mr. Lucas has the burden of establishing the existence of a disability on or before that date. His application was initially denied on September 2, 2011, R. 64-89, and denied again upon reconsideration on October 21, 2011, R. 91-101. Mr. Lucas then requested a hearing in front of an administrative law judge ("ALJ"), which was conducted on September 26, 2012. R. 42-63. The ALJ issued the decision denying Mr. Lucas's DIB application on October 10, 2012. R. 23-29. Mr. Lucas petitioned the Appeals Council for the Office of Disability and Adjudication ("Appeals Council") for review of the ALJ's decision. Ultimately, the Appeals Council denied Mr. Lucas's request for review of the ALJ's decision on November 29, 2013, R. 6-17, and the ALJ's decision became the final decision of the Acting Commissioner. After exhausting his administrative remedies, Mr. Lucas filed his complaint for judicial review of the Acting Commissioner's final decision on July 3, 2014. ECF No. 1. The Acting Commissioner filed an Answer on September 11, 2014. ECF No. 6. Mr. Lucas filed his motion for summary judgment on December 4, 2014, ECF No. 14, and the Acting Commissioner filed a cross-motion for summary judgment on January 5, 2015, ECF No. 16. Mr. Lucas filed a response to the Acting

---

[1] "R." refers to the certified administrative record that was filed under seal on September 11, 2014, pursuant to Eastern District of Virginia Local Civil Rules 5(B) and 7(C)(1).

Commissioner's cross-motion for summary judgment on January 20, 2015. ECF No. 19. No additional briefing was filed, and the time to so file has expired. Accordingly, the matter is ripe for recommended disposition.

## II. RELEVANT FACTUAL BACKGROUND

In his application, Mr. Lucas alleged a disability onset date of April 30, 2009. R. 155. As of that date, Mr. Lucas was a 40 year-old[2] male who had graduated from high school, completed one year of college, and worked as an electrician, painter, carpenter, and truck driver. R. 46. At the hearing on September 26, 2012, Mr. Lucas provided the following testimony:

Mr. Lucas testified that although he is presently married, he is separated from his wife and lives with a friend. R. 46, 50-51. Most recently, Mr. Lucas was employed at Hardees for two and a half months in 2011, where he worked as a dishwasher. R. 47. Mr. Lucas left the employment of Hardees because his "[f]eet just wouldn't hold up." *Id.* Before that, Mr. Lucas's last employment was as an electrician before he was laid off in April 2009, for non-medical related reasons. R. 213-14. During the relevant period, Mr. Lucas resided with his wife, and was capable of preparing meals, watching television, taking medications, caring for his personal needs, and driving occasionally. R. 50-51. Mr. Lucas complained of symptoms caused by his diagnosed diabetes including blurred vision, frequent urination, and dizziness, R. 49, and that insulin and other medications do "not really" maintain his blood sugar levels, R. 48. Mr. Lucas also testified that his medication for bipolar disorder helps "to a point." R. 49. Mr. Lucas described his pain as a burning sensation, and reported that, for five out of seven days a week, he has pain in his feet. R. 51-52. He also reported that his hands "get numb." R. 52.

Mr. Lucas's wife, Teressa Lucas ("Mrs. Lucas"), testified at the hearing on Mr. Lucas's behalf. She testified that although now separated from Mr. Lucas, she still sees him four to five

[2] Mr. Lucas's age classifies him as a "younger individual" as of his DLI. 20 C.F.R. § 404.1563.

3

times per week and does his grocery shopping, laundry, and housework. R. 54-55. She also testified that he tries to cook, has difficulty sleeping due to pain, and cannot remain seated for long periods of time. R. 59.

The medical evidence existing in the record prior to Mr. Lucas's DLI is composed primarily of emergency department visits. R. 261-696, 835-1088, 1119-89. In most of those records, Mr. Lucas presented to the emergency department primarily with symptoms related to his uncontrolled diabetes, chest pain, abdominal pain and neuropathic pain. *Id.* Mr. Lucas's complaints were often related to his non-compliance with his treatment plan, and he recounted to hospital staff on numerous occasions that he had run out of his prescribed medication or could no longer afford them. *Id.* Relating to his complaints of chest pain, a chest x-ray and an echocardiogram were performed on February 9, 2009, and the results were unremarkable. R. 314. X-rays of Mr. Lucas's chest on July 7, 2010, indicated no evidence of active cardiopulmonary disease. R. 533. On August 19, 2010, a CAT scan revealed colonic diverticulosis with no evidence of diverticulitis and a stable abdomen with a horseshoe kidney. R. 386. On December 12, 2010, his diagnosis was listed as "neuropathy v malingering v drug seeking." R. 878. In February of 2011, an x-ray revealed no active cardiopulmonary disease. R. 928, 1028. Thereafter, EKG studies in March and May 2011 were normal, a chest x-ray in July 2011 was normal, and an abdominal ultrasound showed no acute abnormality. R. 646, 849-53, 1057. Mr. Lucas's last hospital visit in the relevant period occurred from August 13, 2011 to August 19, 2011, and he received treatment for uncontrolled diabetes mellitus and chest pain. R. 1119-89. A chest x-ray and CT pulmonary angiogram performed during that time showed unremarkable findings. R. 1126-27. Mr. Lucas was discharged with instructions to continue

medication management, follow a diabetic diet, and follow up with a primary care provider. R. 1142-43.

Mr. Lucas's primary care physician Karen Sullivan, M.D., of Providence Road Family Practice, treated Mr. Lucas from March 2009 to July 2010. R. 758-807. On May 1, 2009, Dr. Sullivan treated Mr. Lucas pursuant to her diagnoses of, *inter alia*, uncontrolled type II diabetes mellitus. R. 768. At that time, Dr. Sullivan discussed Mr. Lucas's noncompliance with treatment and tobacco abuse, noting that it could result in a "shortened lifespan." R. 770. On November 4, 2009, Dr. Sullivan noted that Mr. Lucas was rapidly losing weight, had lost his job seven months earlier, and could no longer afford certain medications. R. 788. She reported that Mr. Lucas "[t]alked to a lawyer about disability" and "[w]as discouraged." *Id.* In December 2009, Mr. Lucas reported that he had no insurance since he was laid off, and he "admit[ted] denial about his diabetes," saying it was "[h]ard to conform" because he was "[u]sed to eating what I want to eat." R. 792. In February 2010, Mr. Lucas presented with pain from his mid-ankles down, stating that it felt "like constant hot pokers." R. 796. Dr. Sullivan diagnosed this as neuropathy. R. 795. On March 4, 2010, Dr. Sullivan again discussed Mr. Lucas's noncompliance with him, noting the following in her treatment notes:

> Discussed his life expectancy is low with this level of nonadherence. Maybe even a year. Not taking his insulin and will go in to a coma. Speaking bluntly, I know money choices are hard, but it doesn't make any sense to pay the c[a]ble tv bill monthly and not buy insulin. As wife has benefits through her job, it makes no sense for him not to be on her plan. And it certainly makes no sens[e] for him not to pay for a vial of insulin which then leads him to have to pay for hospitalization bill.

R. 799. At that time, Dr. Sullivan also reported that Mr. Lucas asked for narcotics and she reported that she was concerned that he was displaying drug seeking behavior. R. 799. She noted that the Neurontin did help with some pain for two to three hours at a time. R. 800.

From September 2010 to July 2011, Mr. Lucas was treated by Pauline Reed, M.D., of Virginia Beach Family Medical Center, for uncontrolled type II diabetes and neuropathy. R. 258-59, 1093-1118.  She reported that Mr. Lucas continued to smoke half a pack of cigarettes a day, and on January 5, 2011, she noted that Mr. Lucas was exhibiting drug seeking behavior.  R. 1103.  On September 12, 2012, Mr. Lucas presented to Dr. Andrei San-Marina, M.D., of the Virginia Beach Family Medical Center for medication refills and a disability letter.  R. 1203.  Dr. San-Marina reported that Mr. Lucas was "non-ill appearing" and "pleasant;" she stated that due to neuropathy, Mr. Lucas "would have to prop his feet up half a working day due to pain in feet aggravated by prolonged standing/sitting." *Id.*

Regarding Mr. Lucas's mental health, on September 20, 2010, Mr. Lucas attended a counseling session with Donna Siller, a licensed social worker, upon referral from Dr. Reed. R. 256.  At that session, Mr. Lucas reported that he was diagnosed with bipolar disorder in 2003 after the death of his first wife.  *Id.*  He said that he "responded well" to Depakote, but discontinued that treatment when he lost his insurance.  *Id.*  Mr. Lucas reported that he "felt better on Depakote." *Id.*  Mr. Lucas was assessed with bipolar disorder and depression.  *Id.* On June 15, 2012, at his attorney's request, Randy Rhoad, Psy.D., a licensed clinical psychologist, evaluated Mr. Lucas.  R. 1193-99. Dr. Rhoad diagnosed Mr. Lucas with mood disorder, bipolar disorder, history of polysubstance dependence, personality disorder, and noted that Mr. Lucas reported diabetes mellitus, hypertension, neuropathy, unemployment, financial stress, and lack of medical insurance coverage.  *Id.* Dr. Rhoads reported the following:

> There are indications that [Mr. Lucas] may experience deficits with his short-term memory functioning.  Of considerable concern is his overall psychiatric history and current presentation.  He displays rather significant mood liability, a tendency to become quickly agitated and irritable, and likely displays a pattern of low frustration

tolerance and lack of anger management. While he may not require significantly extra special supervision in the learning or performing of tasks, accepting instruction from supervisors may be somewhat problematic for him given his overall emotional and personality presentation. . . . Due to his current psychiatric symptoms, he may experience a significant degree of difficulty completing a typical work day or work week in the competitive work environment.

R. 1198. Thereafter, David Rosin, M.D., of the Medical Director of the Community Service Board of Virginia Beach, wrote a letter, opining that Mr. Lucas was unable to work at the time. R. 1202.

Mr. Lucas was assessed by state agency mental health consultant Daniel Walter, Psy.D., on September 1, 2011, who opined that:

[Mr. Lucas] reports functional limitations which include, bending, standing, walking, sitting, kneeling, talking, stair climbing and using hands. While it is credible that [Mr. Lucas] may have some limitations due to his condition, they are not to the extent alleged or described. [Mr. Lucas] indicates in his ASLs that he prepares simple meals daily, does some house and yard work daily, drives a car, goes out alone and shops in stores. While [Mr. Lucas] may have difficulty with memory, completing tasks, concentration, understanding and following instructions, [Mr. Lucas] should be able to perform simple, routine work.

R. 70-71. On September 1, 2011, state agency doctor Michael Cole, D.O., reviewed Mr. Lucas's medical record, opining that Mr. Lucas "is repeatedly noncompliant with his medications" and "is stabilized on his medications." R. 71. Dr. Cole further opined that "[i]t is determined that if the claimant took his prescribed doses of medication that he would be able to control his blood sugars and stay out of the hospital." R. 72. State agency consultant Kim Zweifler, Ph.D., independently reviewed the record on October 14, 2011, and issued similar findings to that of Dr. Walter. R. 81-81, 85-89.

### III. THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

Under the Social Security Administration regulations, a sequential five-step analysis evaluation of a disability claimant's work and medical history is required in order to determine if

the claimant is eligible for benefits. 20 C.F.R. § 404.1520. In evaluating Mr. Lucas's disability claim, the ALJ followed the five-step sequential analysis pursuant to 20 C.F.R. §§ 404.1520(a) and 416.920(a), considering whether Mr. Lucas: (1) was engaged in substantial gainful activity, R. 521; (2) had a severe impairment, R. 522; (3) had an impairment that meets or medically equals a condition within the SSA's listing of impairments, R. 522-25; (4) had an impairment that prevents past relevant work, R. 530-31; and (5) had an impairment that prevents him from any substantial gainful employment, R. 531-35. Between steps three and four, the ALJ determined Mr. Lucas's residual functional capacity ("RFC") upon considering all of his impairments.

Specifically, the ALJ found that Mr. Lucas met the insured requirements of the Social Security Act through December 31, 2014, and he had not engaged in substantial gainful activity since April 30, 2009, the alleged onset date of disability. R. 25. Second, the ALJ determined that Mr. Lucas had the following severe impairments: bipolar disorder, personality disorder, type II diabetes mellitus with neuropathy, and obesity. *Id.* The ALJ found that the other alleged impairments including drug abuse by history was not severe as it "does not cause more than minimal limitation in the claimant's ability to perform basic work activities." R. 26. Third, the ALJ determined that Mr. Lucas did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 22 (citing 20 C.F.R. §§ 404.1520(d); 404.1525; 404.1526). *Id.* The ALJ found that Mr. Lucas failed to make the requisite showing for diabetes mellitus, type II, with neuropathy because he failed to fulfill the criteria of Listing 9.08. *Id.* The ALJ also recognized that Mr. Lucas's obesity could exacerbate the severity of his other impairments, but ultimately found that Mr. Lucas did not

8

satisfy a listing even if his obesity was considered in combination with his other impairments. R. 26-27.   In addition, the ALJ found that Mr. Lucas's mental impairments did not meet the criteria of Listings 12.04 and 12.08 because he did not have at least two marked limitations or one marked limitation and repeated episode of decompensation. R. 27-28.

Next, the ALJ determined that Mr. Lucas has the RFC to perform limited light work with certain limitations. R. 29 (citing 20 C.F.R. § 404.1567(a)). Those limitations include: Mr. Lucas must be able to alternate sitting and standing every thirty minutes, he must not climb, work at unprotected heights, work around dangerous machinery, or perform pushing or pulling with his lower extremities. *Id.* Mr. Lucas is limited to simple and repetitive job tasks without frequent interaction with coworkers or the general public. *Id.* The ALJ compared Mr. Lucas's symptoms to the medical record; ultimately, the ALJ determined that although his impairments could be expected to produce the alleged symptoms, Mr. Lucas's statements were not consistent with the medical record as a whole. R. 29-33.   In reviewing the evidence, the ALJ found that Mr. Lucas's statements were not fully credible and assigned Mr. and Mrs. Lucas's testimony little weight. *Id.* The ALJ assigned moderate weight to the Disability Determination Services opinions "because they are fairly consistent with the evidence of record as a whole." R. 32. The ALJ attributed minimal weight to Dr. Rhoad's functional assessment as it "is inconsistent with [Mr. Lucas's] treatment history and [Mr. Lucas's] activities of daily living." R. 33. The ALJ assigned minimum weight to Dr. Rosin's statements as opinions about the ability to work are reserved for the Commissioner, and Dr. Rosin failed to address Mr. Lucas's activities of daily living, including the fact that Mr. Lucas's symptoms improved with medication. *Id.* The ALJ determined that Mr. Lucas

was unable to perform his relevant past work as it was precluded by his RFC. *Id.* Regardless, the ALJ found that other jobs existed in significant numbers in the national economy that Mr. Lucas could perform, and thus, he was not under disability during the relevant time period. R. 34-35.

On judicial review, Mr. Lucas challenges the final decision of the Acting Commissioner by arguing that the ALJ erred when concluding the Mr. Lucas could perform certain work, citing his neuropathy, mental challenges, and pain in his hands and feet. ECF No. 14. He argued that his records show that he cannot work, and repeats that he is unable to work. *Id.* at 2. However, because there is substantial evidence in the record to support the final decision of the Acting Commissioner, and because the ALJ properly applied the law in Mr. Lucas's case, the undersigned would recommend that the Court grant the Acting Commissioner's motion for summary judgment, and affirm the final decision of the Acting Commissioner.

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th

Cir. 1996). If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

### 1. The ALJ's Decision is Substantially Supported by the Record

The ALJ properly concluded that Mr. Lucas's impairments, although severe, did not prevent him from performing certain work that existed in the national economy. Ultimately, the ALJ determined that Mr. Lucas has the RFC to perform limited light work with certain limitations. R. 29 (citing 20 C.F.R. § 404.1567(a)). Those limitations include: Mr. Lucas must be able to alternate sitting and standing every thirty minutes, he must not climb, work at unprotected heights, work around dangerous machinery, or perform pushing or pulling with his lower extremities. *Id.* Mr. Lucas is limited to simple and repetitive job tasks without frequent interaction with coworkers or the general public. *Id.*

The regulations provide that after step three of the ALJ's five-part analysis, but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC. 20 C.F.R. § 404.1545(a). The RFC is a claimant's maximum ability to work despite his limitations. *Id.* § 404.1545(a)(1). The determination of RFC is based on a consideration of all the relevant medical and other evidence in the record. 20 C.F.R. §

404.1545(a)(3).[3]   When determining Mr. Lucas's RFC, the ALJ considered (1) the impairments

as supported by the objective medical evidence and (2) the impairments based on Mr. Lucas's

subjective complaints.   *Craig v. Chater*, 76 F.3d 586, 594 (4th Cir. 1996).   When considering

Mr. Lucas's subjective complaints and allegations of functional limitations, the ALJ must make a

credibility assessment of the intensity of the symptoms to determine the true degree of limitation.

*Id.*; *see also* 20 C.F.R. § 404.1529(a); SSR 96-7p.   Under the *Craig* test, the ALJ must first

determine whether there is an underlying medically-determinable physical or mental impairment

that reasonably could produce the pain or symptoms.   *Id.*   If so, then the second step requires the

ALJ to evaluate the claimant's statements about the intensity and persistence of the pain and the

---

[3] In *Mascio v. Colvin*, the Fourth Circuit recently discussed whether an ALJ's comparison of a claimant's alleged functional limitations to the claimant's residual functional capacity, as opposed to her pain and other symptoms, was in error.   780 F.3d 632, 636 (4th Cir. 2015).   In *Mascio*, the Fourth Circuit rejected a per se rule, and instead held that "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review."   *Id.* (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).   The Fourth Circuit specifically noted that even if the ALJ did compare the claimant's functional limitations to the claimant's residual functional capacity, the error would be harmless if the ALJ did, in fact, properly analyze the claimant's credibility elsewhere.   *Id.* at 637.   Here, the ALJ wrote: "the claimant's statements . . . are not entirely credible to the extent they are inconsistent with the above residual functional capacity assessment."   R. 29.   Initially, this language may appear in conflict with the Fourth Circuit's ruling in *Mascio*, but the error was harmless because "[u]nlike the ALJ in *Mascio*, the ALJ here clearly considered Plaintiff's limitations, and developed a wholesome record on how those limitations conflicted with the objective medical evidence."   *Sharp v. Colvin*, No. 3:14CV340-HEH, 2015 WL 1517416, at *4 (E.D. Va. Apr. 1, 2015) (citing *Mascio*, 780 F.3d at 639); *see also Long v. Colvin*, No. 1:13CV659, 2015 WL 1646985, at *1 (M.D.N.C. Apr. 14, 2015) ("Although the [boilerplate] language used by the ALJ suffers some of the similar defects as in *Mascio*, the ALJ in this case 'properly analyzed [Plaintiff's] credibility elsewhere,' something the Fourth Circuit recognized would render this 'Bjornson error' harmless.") (quoting *Mascio*, 780 F.3d at 639).   The ALJ compared Mr. Lucas's alleged limitations to the medical record.   R. 24-33.   This is what *Mascio* requires.   *Mascio*, 780 F.3d at 639 ("[T]he ALJ should have compared Mascio's alleged functional limitations from pain to the other evidence in the record, not to Mascio's residual functional capacity.").   Unlike *Mascio*, the ALJ cited evidence from the record to support his RFC and announced the weight that he gave to various RFC assessments, including Mr. Lucas's own statements, Mrs. Lucas's statements, Mr. Lucas's treating physicians, and the state agency doctors.   R. 29-33.   Thus, the ALJ properly compared Mr. Lucas's limitations to the medical record.

extent to which it affects or limits the ability to work. *Id.* Throughout the analysis, the ALJ must

sufficiently explain the conclusions, including the weight assigned to the relevant evidence, so

that a reviewing court can evaluate the basis for the final decision. *Ivey v. Barnhart*, 383 F.

Supp. 2d 387, 389-90 (E.D.N.C. 2005) (citing *Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir.

1977)). However, "[b]ecause he had the opportunity to observe the demeanor and to determine

the credibility of the claimant, the ALJ's observations concerning these questions are to be given

great weight." *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984) (citing *Tyler v.

Weinberger*, 409 F. Supp. 776 (E.D. Va. 1976)).

After considering the totality of the evidence in the record, the ALJ determined that Mr.

Lucas's alleged symptoms were inconsistent with the "objective findings and subjective findings

on examinations," R. 32, and that both Mr. and Mrs. Lucas's testimony were "not supported by

the evidence or record as a whole," R. 33.  The ALJ specifically noted that although Mr. Lucas

"present[ed] with a history of diabetes mellitus (type 2) with neuropathy," Mr. Lucas "is

frequently non-compliant with his medications." R. 32.  Indeed, it was appropriate for the ALJ to

consider Mr. Lucas's non-compliance with treatment when determining Mr. Lucas's RFC. *See,

e.g.*, *Staton v. Colvin*, No. 2:13cv572, 2015 WL 627876, at *9-11 (E.D. Va. Feb. 6, 2015)

(finding that substantial evidence supported the ALJ's RFC determination when, in part, the

claimant was reportedly noncompliant with her diabetes treatment).  In addition, the ALJ also

cited evidence that Mr. Luca's "condition has improved with medications, as indicated by [Mr.

Lucas's] testimony."   R. 33.   The ALJ also cited Mr. Lucas's own recitation of his daily

activities, finding that Mr. Lucas "has described daily activities that are not limited to the extent

one would expect, given [Mr. Lucas's] complaints of disabling symptoms and limitations." R.

33.  In reaching these determinations, the ALJ considered that Mr. Lucas had a history of type II

diabetes mellitus and neuropathy. R. 30-31. He cited treatment notes from Dr. Sullivan, Dr. Reed and other evidence which recounted Mr. Lucas's ongoing treatment of his diabetes and related neuropathy and the fact that Mr. Lucas was non-adherent to his treatment regimen. *Id.* The ALJ discussed Mr. Lucas's medical records from his numerous emergency facility treatments which, in relevant part, were normal. *Id.* The ALJ also discussed treatment notes and evaluations pertaining to Mr. Lucas's mental health, in particular his diagnosed bipolar disorder, and relied on Mr. Lucas's own testimony that "he is calmer with medications." R. 33. Based on all this, the ALJ appropriately determined Mr. Lucas's RFC.

In addition, the ALJ properly assigned minimal weight to Drs. Rhoad and Rosin as their opinions conflicted with the medical record and with Mr. Lucas's own testimony and daily activities. R. 33. Although the ALJ did not specifically cite Dr. San-Marina's opinion in his discussion, this is not fatal to the ALJ's determination. First, Mr. Lucas presented to Dr. San-Marina on a one-time basis, specifically for a disability letter. Moreover, had the ALJ explicitly considered Dr. San-Marina's opinion in his written opinion, he likely would have found it inconsistent with the record, specifically with Mr. Lucas's own statements of his daily activities. Second, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *Reid v. Comm'r*, 769 F.3d 861, 865 (4th Cir. 2014). Here, the ALJ made his findings "based on a consideration of the entire case record," R. 29, "and, absent evidence to the contrary, we take [the ALJ] at h[is] word," *Reid*, 769 F.3d at 865. Again, it is not this Court's role to re-weigh the evidence, make credibility determinations, or substitute its judgment for that of the Commissioner, but rather, only to see if there is substantial evidence, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. Here, the above cited record provides substantial evidence to support the ALJ's

14

findings, and constitutes relevant evidence that a reasonable mind might accept the ALJ's conclusion as adequately supported.

## VI. <u>RECOMMENDATION</u>

For these reasons, the undersigned **RECOMMENDS** that Mr. Lucas's motion for summary judgment, ECF No. 14, be **DENIED**; the Defendant's motion for summary judgment, ECF No. 16, be **GRANTED**; and the final decision of the Acting Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## VII. <u>REVIEW PROCEDURE</u>

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this report and recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

2. The United States District Judge shall make a de novo determination of those portions of this report and recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this report and recommendation to the

*pro se* Plaintiff and counsel of record for the Defendant.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
June 29, 2015

## CLERK'S MAILING CERTIFICATE

A copy of this Report and Recommendation was mailed on this date to the following:

Mr. Corey Lucas
4415 E. Honeygrove Court
Virginia Beach, Virginia 23455
*Pro Se* Plaintiff

Mr. Mark Anthony Exley
Assistant United States Attorney
United States Attorney's Office
101 West Main Street
Norfolk, Virginia 23510-1671
Counsel for Defendant

Fernando Galindo
Clerk of Court

_____
Deputy Clerk
Date:

17